DOCKET NO. 14-14525

# United States Court of Appeals

*for the*

# Eleventh Circuit

———— • ————

RAANAN KATZ,

*Plaintiff/Appellant,*

*v.*

IRINA CHEVALDINA,

*Defendant/Appellee.*

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 1:12-cv-22211-JLK

## INITIAL BRIEF OF APPELLANT

ALAN J. KLUGER, FL BAR NO. 200379
TODD A. LEVINE, FL BAR NO. 899119
JORGE R. DELGADO, FL BAR NO. 084118
KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.
201 South Biscayne Boulevard
Twenty-Seventh Floor
Miami, Florida 33131
T: (305) 379-9000
F: (305) 379-3428

*Counsel for Plaintiff/Appellant*

Raanan Katz v. Irina Chevaldina, 11th Circuit Docket No. 14-14525

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

1.    Chevaldina, Irina, Defendant/*pro se* Appellee;

2.    Delgado, Jorge R., Attorney for Appellant;

3.    Katz, Raanan, Plaintiff/Appellant;

4.    King, James L., United States District Judge, Southern District of Florida;

5.    Kluger, Alan J., Attorney for Appellant;

6.    Kluger, Kaplan, Silverman, Katzen & Levine, PL, Attorney for Appellant;

7.    Kuehne, Benedict P., Trial Attorney for Appellee;

8.    Law Office of Benedict P. Kuehne, P.A., Trial Attorney for Appellee;

9.    Levine, Todd A., Attorney for Appellant;

10.    McAliley, Chris M., United States Magistrate Judge, Southern District of Florida;

11.    Peter J. Solnick PA, Trial Attorney for Appellee;

12.    Solnick, Peter J., Trial Attorney for Appellee;

13.    Torres, Edwin G., United States Magistrate Judge, Southern District of Florida;

14.    There is no interested party that is a publicly traded corporation.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant, Raanan Katz ("Katz"), respectfully requests oral argument. "The fair use doctrine has been called 'the most troublesome in the whole law of copyright.'" *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012). It involves the equitable, case-by-case evaluation of multiple complex factors. *Peter Letterese And Associates, Inc. v. World Inst. Of Scientology Enterprises*, 533 F.3d 1287, 1308 (11th Cir. 2008). This analysis is made the more difficult by Appellee, Irina Chevaldina's ("Chevaldina"), prolific and systemic infringement of Plaintiff's copyrighted photograph (the "Photo"), which appears in at least 25 blog posts. [ECF No. 96–10]. Katz submits oral argument would assist the Court in reaching its decision.

## **TABLE OF CONTENTS**

Certificate of Interested Persons ............................................................ C-1

Statement Regarding Oral Argument ........................................................ i

Table of Contents ...................................................................................... ii

Table of Citations ...................................................................................... v

Statement of Subject Matter and Appellate Jurisdiction ....................... viii

Statement of the Issues .............................................................................. 1

Statement of the Case ................................................................................ 2

    I.  Course of Proceedings Below ........................................................... 2

    II. Statement of Facts ........................................................................... 3

        A. The Parties ................................................................................. 3

        B. The Photo ................................................................................... 3

        C. The Blog Posts ........................................................................... 4

        D. Chevaldina's Unauthorized Copying of the Photo in 25 Different
           Blog Posts ................................................................................. 5

           1.  Chevaldina's Use of the Unaltered Photo ........................... 5

           2.  Chevaldina's Use of the Photo with Captions...................... 9

           3.  Chevaldina's Use of the Photo within Cartoons ................ 10

        E. Chevaldina's Alleged Reasons for Using the Photo ............... 11

        F. Chevaldina's Temporary Replacement of the Photo in the Blog
           Posts ....................................................................................... 13

G. The State Court Action Against Chevaldina and the Settlement She Solicited From the State Court Plaintiffs ................................................ 14

III. Standard of Review ....................................................................... 17

Summary of the Argument ................................................................. 17

Argument .......................................................................................... 21

I. The District Court's Methodology for Assessing Fair Use was Erroneous Because the District Court did not Perform a "Work-By-Work" Analysis on Each Individual Instance of Infringement ................... 21

II. The District Court Erred in Finding that the First Fair Use Factor Favored Chevaldina as a Matter of Law ....................................... 27

A. Chevaldina's use of the Photo was Not Noncommercial as a Matter of Law ................................................................................ 27

B. Chevaldina's use of the Photo was Not Transformative as a Matter of Law ................................................................................ 30

1. Authority Governing Whether Use of the Photo was Transformative ........................................................................ 30

2. Application to the Case *Sub Judice* ................................... 35

III. The District Court Erred in Finding that the Nature of the Photo Weighed in Favor of Fair Use as a Matter of Law ....................... 41

A. The Photo has Mixed Elements of Fact and Creativity, Making this Factor Neutral ............................................................................ 42

IV. The District Court Erred in Finding that the Amount and Substantiality of Chevaldina's Use of the Photo Was Neutral ............................ 44

V. The District Court Erred in Finding that the Effect on the Market of the Photo Weighs in Favor of Fair Use as a Matter of Law ................ 45

iii

Conclusion ............................................................................................................. 53

Certificate of Compliance ...................................................................................... 55

Certificate of Service ............................................................................................. 56

# TABLE OF CITATIONS

**Cases**

*A.V. v. iParadigms, LLC,*
      562 F.3d 630 (4th Cir. 2009) ................................................................ 32, 36

*Anderson v. Liberty Lobby, Inc.,*
      477 U.S. 242 (1986) ....................................................................................... 29

*Balsley v. LFP, Inc.,*
      691 F.3d 747 (6th Cir. 2012) ................................................................ 42, 43

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
      448 F.3d 605 (2d Cir. 2006) ................................................................ 33, 36

*BWP Media USA, Inc. v. Gossip Cop Media, LLC,*
      No. 13 CIV. 7574 KPF, 2015 WL 321863 (S.D.N.Y. Jan. 26, 2015).... 31, 42

*Cambridge Univ. Press v. Patton,*
      769 F.3d 1232 (11th Cir. 2014) ............................................................ passim

*Campbell v. Acuff-Rose Music, Inc.,*
      510 U.S. 569 (1994) .................................................................................. passim

*Cariou v. Prince,*
      714 F.3d 694 (2d Cir. 2013) *cert. denied*, 134 S. Ct. 618 (2013) ................ 23

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,*
      150 F.3d 132 (2d Cir. 1998) ....................................................................... 48

*Dhillon v. Does 1-10,*
      No. C 13-01465 SI, 2014 WL 722592 (N.D. Cal. Feb 25, 2014) ......... passim

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985)................................................................... 22, 27, 42, 45


*Hill v. Pub. Advocate of the United States*,
    No. 12-CV-02550-WYD-KMT,
    2014 WL 1293524 (D. Colo. Mar. 31, 2014)............................ 32, 36, 39, 49


*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ................................................................. 33, 36


*Kienitz v. Sconnie Nation LLC*,
    965 F. Supp. 2d 1042 (W.D. Wis. 2013)................................................ 42, 43


*LaChapelle v. Fenty*,
    812 F. Supp. 2d 434 (S.D.N.Y. 2011) ............................................. 34, 39, 49


*Latimer v. Roaring Toyz, Inc.*,
    601 F.3d 1224 (11th Cir. 2010) ................................................. 17, 26, 39, 49


*Latimer v. Roaring Toyz, Inc.*,
    No. 806-CV-1921-T-30AEP, 2010 WL 3747148
    (M.D. Fla. Sept. 21, 2010)............................................................................ 32


*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ............................................................. passim


*Morris v. Young*,
    925 F. Supp. 2d 1078 (C.D. Cal. 2013)...................................... 32, 35, 39, 49


*Murphy v. Millennium Radio Group LLC*,
    650 F.3d 295 (3d Cir. 2011) ................................................................. 31, 35


*N. Jersey Media Group Inc. v. Pirro*,
    No. 13 CIV. 7153 ER, 2015 WL 542258 (S.D.N.Y. Feb. 10, 2015) ........... 31

vi

*Nunez v. Caribbean Intern. News Corp.*,
　　235 F.3d 18 (1st Cir. 2000)............................................................. 33, 36, 43


*Perfect 10, Inc. v. Amazon.com, Inc.,*
　　508 F.3d 1146 (9th Cir. 2007) ............................................................. 32, 36


*Peter Letterese And Associates, Inc. v. World Inst. Of Scientology Enterprises*,
　　533 F.3d 1287 (11th Cir. 2008) ............................................................. passim

*Righthaven, LCC v. Jama*,
　　No. 2:10-CV-1322 JCM LRL, 2011 WL 1541613
　　(D. Nev. April 22, 2011)................................................................. 49


*Shultz v. Sec'y of U.S. Air Force*,
　　522 Fed. Appx. 503 (11th Cir. 2013) ..................................................... 17, 29


*Suntrust Bank v. Houghton Mifflin Co.*,
　　268 F.3d 1257 (11th Cir. 2001) ..................................................... 27

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
　　227 F.3d 1110 (9th Cir. 2000) ..................................................... 47

## Rules, Statutes, and Other Authorities

17 U.S.C. § 107 ............................................................................... 22, 25

17 U.S.C. § 501 ............................................................................... 2

28 U.S.C. § 1291 ............................................................................... viii

28 U.S.C. § 1331 ............................................................................... viii

28 U.S.C. § 1338(a) ........................................................................... viii

## STATEMENT OF SUBJECT-MATTER AND
## <u>APPELLATE JURISDICTION</u>

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over this direct appeal from a final order on the merits and a final judgment of the District Court of the Southern District of Florida. Jurisdiction was proper in the District Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## STATEMENT OF THE ISSUES

1.      Whether the District Court's methodology for applying Chevaldina's fair use affirmative defense was erroneous when the District Court did not perform a "work-by-work" analysis of Chevaldina's multiple infringements.

2.      Whether the District Court erred in finding that the purpose of Chevaldina's multiple infringements of the Photo weighed in favor of fair use as a matter of law.

3.      Whether the District Court erred in finding that Chevaldina's multiple infringements of the Photo was not commercial as a matter of law.

4.      Whether the District Court erred in finding that Chevaldina's multiple infringements of the Photo was transformative as a matter of law.

5.      Whether the District Court erred in finding that the amount and substantiality of the Photo Chevaldina copied was neutral as a matter of law.

6.      Whether the District Court erred in finding that the nature of the Photo weighed in favor of fair use as a matter of law.

7.      Whether the District Court erred in finding that the effect on the potential market for the Photo due to Chevaldina's multiple infringements weighed in favor of fair use as a matter of law.

8.      Whether the District Court erred in failing to consider Chevaldina's pervasive bad faith when conducting its fair use analysis.

1

## STATEMENT OF THE CASE

### I.    Course of Proceedings Below

Katz sued Chevaldina for direct copyright infringement under 17 U.S.C. § 501 due to her multiple, unauthorized copying of the Photo—an image of Katz whose copyright he owns—within her prolific internet blog posts.  [ECF No. 10].  Katz also averred that Chevaldina used the Photo "in rapid succession . . . in her efforts to cause [Katz] harm or unlawfully extract money" from Katz.  [Katz Aff. ¶ 7, ECF No. 116–1].  Chevaldina moved to dismiss Katz's claim based on the affirmative defense of fair use, [ECF No. 14], but the District Court denied the motion to dismiss. [ECF No. 21].

After the close of discovery, Katz moved for summary judgment on his affirmative claims and all of Chevaldina's affirmative defenses.  [ECF No. 92]. Chevaldina filed a cross-motion for summary judgment on several of her affirmative defenses, including fair use.  [ECF No. 94].

The motions for summary judgment were considered by the Magistrate Judge, who recommended that the District Court grant Chevaldina's cross-motion for summary judgment based on the finding that Chevaldina's use of the Photo was fair use as a matter of law.  [ECF No. 148].[1]  Katz filed timely Objections to the Report

---

[1] The District Court did not address the other issues raised by Chevaldina.  [ECF No. 148 at 5–6 n.5].

and Recommendation on Cross-Motions for Summary Judgment. [ECF No. 159]. The District Court overruled the Objections, and entered an Order Granting Defendant's cross-motion for summary judgment, which adopted the Magistrate Judge's Report and Recommendation. [ECF No. 167].[2] The District Court issued a Final Judgment the same day. [ECF No. 168]. This appeal timely followed. [ECF No. 169].

## II.    Statement of the Facts

### A.    The Parties

Katz owns and operates shopping centers throughout Florida and New England through his corporate entities collectively known as RK Centers. [ECF No. 93 at ¶ 1], [ECF No. 94 ¶ 2]. He is a minority investor in the limited partnership that owns the professional basketball team, the Miami Heat. [Katz Aff. ¶ 3, Oct. 7, 2013, ECF No. 116–1]. Chevaldina is a former tenant in one of Katz's shopping centers. [Chevaldina Dep. 26:4–15, 27:4–15, July 29, 2013, ECF No. 96–6].

### B.    The Photo

While attending a basketball practice in Israel, Seffi Magriso ("Magriso"), a freelance photographer, took the candid Photo of Katz. [Katz Dep. 69:24–70:9,

---

[2] Going forward, any references in this Brief to the "District Court," and its findings and conclusions, shall collectively refer to the findings and conclusions of the Magistrate Judge as adopted by the District Judge.

3

71:4–10, 77:23–78:1, 126:4–15, Dec. 18, 2012, ECF No. 96–1, 96–2].  The Photo

captured Katz as he was falling and losing his balance, which caused him to stick

out his tongue in a compromising, embarrassing position.  [Katz Aff. ¶ 6, ECF No.

116–1].  The Photo later appeared in an Israeli newspaper called *Haaretz*, in an

article titled: "Basketball / Ex-Maccabi Tel Avi co-owner closer to buying into

Hapoel Jerusalem."  [ECF No. 96–5].  The article was about Katz possibly

purchasing an interest in an Israeli basketball team.  [ECF No. 96–5].

Katz entered into an Assignment of Copyright with Magriso, thereby gaining

ownership of the Photo and its copyright.  [ECF No. 96–14].  Katz also filed a

Certificate of Registration with the Copyright Office.  [ECF No. 96–14].  Katz

averred in his affidavit that he did not acquire the Photo to bring litigation against

Chevaldina; in his words:

> To the contrary, I have been trying to avoid litigation with her.
> However, despite my requests that she cease and desist from infringing
> on my copyright, defaming me, tortiously interfering with my
> contractual and business relationships and otherwise seeking to cause
> me harm, Ms. Chevaldina has continued to infringe my copyright and
> attack me, my family and my businesses in her blogs. Consequently, I
> had no choice to but to protect myself from Ms. Chevaldina's pervasive
> misconduct.

[Katz Aff. ¶ 18, ECF No. 116–1].

### C.    The Blog Posts

On May 3, 2011, Chevaldina authored an internet blog post accusing Katz of

having a criminal record and a record of discrimination, referencing two decades-

old court opinions. [ECF No. 96–10 at 1–2]. The Photo was included in that first blog post, without any alterations. [ECF No. 96–10 at 1–2]. That blog post was followed by many others using the Photo spanning several years (to date), which targeted not only Katz, but also Katz's businesses and members of his family. [ECF No. 96–10]. As Katz stated in his affidavit, Chevaldina used the Photo "in rapid succession . . . in her efforts to cause [Katz] harm or unlawfully extract money" from Katz. [Katz Aff. ¶ 7, ECF No. 116–1].

### D. *Chevaldina's Unauthorized Copying of the Photo in 25 Different Blog Posts*

Both before and during the pendency of the underlying lawsuit, Chevaldina published the Photo in 25 different blog posts of varying subject matter. [ECF No. 96–10]. The Photo appears in the blog posts one of three ways: (1) copied without modification;[3] (2) copied with a caption added to it; or (3) cropped to Katz's face, which is placed in cartoons. [ECF No. 96–10].

### 1. Chevaldina's Use of the Unaltered Photo

In the first category, Chevaldina copied the Photo (either its full or cropped version) ten times, without any alteration, within the following blog posts:

---

[3] The original Photo has slightly different dimensions from the Photo as posted in *Haaretz* (which is cropped at Katz's forehead). [ECF Nos. 96–5, 96–14]. Both versions are included in the Assignment of Copyright Katz signed with Magriso. [ECF No. 96–14]. In any event, Chevaldina used both variations of the Photo in her blog posts, as more specifically discussed herein. [ECF No. 96–10].

5

- A blog post titled, "RK Associates History and Some Facts," published May 3, 2011. [ECF No. 96–10 at 1–2]. The blog post includes biographical information on Katz from RK Centers' website, and then claims that Katz has "criminal and discriminatory records," including links to two court opinions. [*Id.*].

- A blog post titled, "RK Associates and Raaanan [sic] Katz Trying To Wipe Out Their Debt Using Miami Heat Players," published September 18, 2011. [ECF No. 96–10 at 3–5]. In the blog post, Chevaldina includes a letter from Katz to the City of North Miami where Katz proposes to settle a code enforcement lien by donating $10,000 for a "basketball shooting skills tournament," and then "use [his] best efforts to secure a current or former Miami Heat player to attend the event." [ECF No. 96–10 at 4].

- A blog post titled, "How RK Associates Ripped Off The Single Mother Of Special Needs Child," published September 18, 2011. [ECF No. 96–10 at 6–8]. In it, Chevaldina falsely claims that Katz, his son, and his companies wrongly sued the Jewish mother of a special-needs child, portraying Katz and his son as anti-Semitic. [*Id.*]. Katz averred in an affidavit that his company simply sued a tenant that breached a lease agreement; he had no idea that the woman had a disabled child or was Jewish. [Katz Aff. ¶ 14, ECF No. 116–1]. Katz is himself Jewish. [*Id.*].

- A blog post titled, "Raanan Katz Targets Fundamentals of American Democracy with Libel Lawsuit," published December 13, 2011. [ECF No. 96–10 at

6

11–12]. In it, Chevaldina accuses Katz of trying to suppress freedom of speech in his state court lawsuit against her (described in detail below). [*Id.*].

- A blog post titled, "Raanan Katz 'Business Model' Makes Defaults Profitable?", published February 5, 2012. [ECF No. 96–10 at 13–14]. In it, Chevaldina claims that Katz's business has a "default model" involving automatic lease renewal provisions, acceleration clauses and demands for "double rent." [*Id.*].

- A blog post titled, "Why RK Centers Was The Wrong Choice," published March 4, 2012. [ECF No. 96–10 at 17–18]. In it, Chevaldina states she is writing a book about her experiences at RK Centers and how to choose a commercial landlord:

> I am in the process of writing a book "Why RK Centers Was The Wrong Choice", therefore, my postings will be shorter.
>
> My book is about personal experience in business start up and development. I hope my book will help ambitious people in their dream to be successful without selling the soul to the evil.
> How to make educated decision in selecting your first commercial landlord. In case, you made the wrong choice, how not to lose your own dignity, and sustain pressure from commercial landlord to make you fail and lose.
>
> How to be effective, while remaining under stress from your commercial landlord's harassment, and most importantly, making your brain available so, you can continue to be creative in developing your business ideas.

[ECF No. 96–10 at 17].

When asked about the book at deposition, Chevaldina testified that she had not yet completed it because of the lawsuit between the parties. [Chevaldina Dep. 131:7–22, ECF No. 96–7].

• A blog post titled, "Raanan Katz Is Making Money In Miami On Fire Sprinklers Repair?", published April 18, 2012. [ECF No. 96–10 at 25–27]. In it, Chevaldina accuses Katz of an alleged common area maintenance scheme involving fire sprinkler repairs. [*Id.*].

• A blog post titled, "Raanan Katz Team Is Working Really Hard Setting RK Centers Maintenance Goals?", published April 26, 2012. [ECF No. 96–10 at 31–32]. In it, Chevaldina again accuses Katz of an alleged common area maintenance scheme involving fire sprinkler repairs. [*Id.*].

• A blog post titled, "RK Centers, Raanan Katz: Double Rent Demand Is it Legal?", published May 18, 2012. [ECF No. 96–10 at 37–38]. In it, Chevaldina again accuses Katz of an alleged "double rent" scheme. [*Id.*].

• A blog post titled, "Raanan Katz, Miami Heat Owner, Drops Lawsuit Against Google," published July 20, 2012. [ECF No. 96–10 at 39–41]. In it, Chevaldina states that Katz dropped Google as a defendant in the underlying lawsuit, and accuses Katz of bringing frivolous claims. [*Id.*].

## 2.    Chevaldina's Use of the Photo with Captions

In the second category, Chevaldina copied the Photo an additional five times, adding a caption with one of two messages, as follows:

- In a blog post titled, "Memorandum of Lease Between RK Centers and Ross for Less," published September 10, 2012, the Photo is copied with a caption added reading: "DEAL WITH HIM AT YOUR OWN RISK." [ECF No. 96–10 at 44]. In the blog post, Chevaldina accuses Katz of including "Gotcha clauses" in certain tenant leases, but not others. [*Id.*].

- In a blog post titled, "Raanan Katz is America's Next Top Model?", published September 12, 2012, the Photo is copied with a caption added stating: "HE RIPPED-OFF SPECIAL NEEDS LITTLE JEWISH GIRL." [ECF No. 96–10 at 45–46]. In the blog post, Chevaldina disparages Katz's response in opposition to the motion to dismiss filed in the underlying lawsuit. [*Id.*].

- In a blog post titled, "RK Centers Filed Lawsuit Against iProFix.com, Inc In Miami," published September 15, 2012, the Photo is copied with a caption added reading: "HE RIPPED-OFF SPECIAL NEEDS LITTLE JEWISH GIRL." [ECF No. 96–10 at 47]. In the blog post, Chevaldina states that one of Katz's companies and a tenant are involved in a lawsuit. [*Id.*].

- In a blog post titled, "RK Centers Registered Trademark for Financial Affairs, Monetary Affairs," published September 23, 2012, the Photo is copied with

a caption added reading: "HE RIPPED-OFF SPECIAL NEEDS LITTLE JEWISH GIRL." [ECF No. 96–10 at 48–49]. In it, Chevaldina writes about the registration of the service mark, "RK Associates," which is unrelated to this lawsuit. [*Id.*].

- In a blog post titled, "How Miami Heat Owner Raanan Katz Is Trying to Use Miami Heat Players To Wipe Out RK Centers Debt," published September 25, 2012, the Photo is copied with a caption added reading: "HE RIPPED-OFF SPECIAL NEEDS LITTLE JEWISH GIRL." [ECF No. 96–10 at 50–51]. This post is a rehashing of the earlier September 18, 2011 post of the same subject. [ECF No. 96–10 at 3–5].

### 3.    Chevaldina's Use of the Photo within Cartoons

In her remaining uses, Chevaldina crops the Photo to Katz's face, which is superimposed over cartoon figures; specifically in:

- A blog post titled, "Raanan Katz: Who is Next?", published November 14, 2011. [ECF No. 96–10 at 9].

- A blog post titled, "Raanan Katz Daniel Katz Looking for New Victim," without a date of publication. [ECF No. 96–10 at 10].

- A blog post titled, "Raanan Katz Gets Ready For Deposition?", published February 19, 2012. [ECF No. 96–10 at 15].

- A blog post titled, "Raanan Katz Tenant Was Found Guilty Of A First-Degree Misdemeanor," published March 2, 2012. [ECF No. 96–10 at 16].

10

- A blog post titled, "Daniel Katz Saga Of Fears Of Violence Continues," published March 9, 2012. [ECF No. 96–10 at 19–21]. The topic of the blog post concerns Daniel Katz ("Daniel"), who is Katz's son, and not Katz himself.

- A blog post titled, "RK Centers: Daniel Katz Real Fear, Fake Fear, Or No Fear?", published April 2, 2012. [ECF No. 96–10 at 22–24]. The topic of the blog post is again Daniel, and not Katz himself.

- A blog post titled, "RK Centers Maintenance Meeting in Progress," published April 19, 2012. [ECF No. 96–10 at 28–30].

- A blog post titled, "RK Centers: How To Rip-Off People On Common Area Maintenance in Miami?", published April 29, 2012. [ECF No. 96–10 at 33–35].

- A blog post titled, "Raanan Katz: Operating Expenses, The Myth and The Reality?", published May 1, 2012. [ECF No. 96–10 at 36].

- A blog post titled, "RK Centers, Raanan Katz, Free Speech With A Public Issue," published August 27, 2012. [ECF No. 96–10 at 42–43].

### E.    *Chevaldina's Alleged Reasons for Using the Photo*

When Chevaldina was asked at her deposition why she repeatedly used the Photo in her various blog posts, she gave varied answers. [*See, generally,* ECF Nos. 96–6, 96–7]. At first, Chevaldina answered that the ugly nature of the picture was in parity with the way she contends Katz conducts business. [Chevaldina Dep. at

11

93:1–95:23, ECF No. 96–6]. She likewise testified that a "nasty face" is reflective of a "nasty business," [Chevaldina Dep. at 114:4–115:8, ECF No. 96–7] and that the "unflattering" picture matched what she deemed to be unflattering conduct. [Chevaldina Dep. at 120:13–121:3, ECF No. 96–7].

Chevaldina then admitted, however, that she did not consider the picture to be flattering or unflattering, but that she actually used the picture to identify Katz because it was the only picture she had:

126:8    Q    Do you think this is a flattering
126:9    picture?
***
*126:12        THE WITNESS:  I don't think it's*
*126:13    flattering or unflattering.  I am thinking*
*126:14    that once you're writing an article and you*
*126:15    say this person invented something people*
*126:16    would like to see who's done it.  So this is*
*126:17    the only picture that I had.*
126:18        BY MR. KLUGER:
126:19    Q    Your testimony is that's the only
126:20    picture that you could have used on that blog; is
126:21    that what you're saying?
***
126:24        THE WITNESS:  Yes . . . .

[Chevaldina Dep. at 126:8–24, ECF No. 96–7 (emphasis added)].

Chevaldina likewise testified that the fact Katz was sticking out his tongue did not matter; she wanted people to know who he is:

142:18    Q    But tell me how the photograph of
142:19    Katz with his tongue out is being fairly used
142:20    by you to communicate something?
***

12

142:23    THE WITNESS:  First of all, he doesn't
142:24    own the picture.  *Second of all it doesn't*
*142:25    matter if he is with a tongue out or not and*
*143:1     thirdly people need to see his face so they*
*143:2     know who is doing this type of stuff.*

[Chevaldina Dep. at 142:18–143:2, ECF No. 96–7 (emphasis added)].

### F.    *Chevaldina's Temporary Replacement of the Photo in the Blog Posts*

During the pendency of the underlying lawsuit, Chevaldina temporarily removed the blog posts with the Photo or replaced the Photo in her blog posts with other images of Katz, images of other people, or images of various objects.  [ECF No. 93 ¶ 39]; [ECF No. 117 ¶ 39]; [ECF No. 96–16].  For instance, in the May 3, 2011 and September 10, 2012 blog posts, Chevaldina removed the Photo and replaced it with an image of a "Raanan Katz Blvd" street sign above a Russian-language banner.  [ECF No. 96–16 at 1, 29].  Chevaldina testified that the Russian words are an idiom that translates to "your place is next to the dirty toilet." [Chevaldina Dep. at 110:19–112:1, ECF Nos. 96–6, 96–7].  In other blog posts, Chevaldina removed the Photo and included new crude cartoons that either used a different image of Katz, or solely the face of Daniel.  *See* [ECF No. 96–16 at 5, 7, 9, 11, 13, 15, 20, 22, 28, 33].  In other instances, Chevaldina removed the Photo and replaced it with an image of Katz shooting a basketball, with the caption "DON'T MISS IT."  [ECF No. 96–16 at 17, 24, 31, 35, 37].

### G.    *The State Court Action Against Chevaldina and the Settlement She Solicited From the State Court Plaintiffs*

Apart from the underlying lawsuit, Katz; his son, Daniel; and several RK Centers entities filed a lawsuit in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, in a case currently styled *R.K./FL Management, Inc. et al. v. Chevaldina, et al.,* Case No. 11-17842 CA (32) (the "State Court Action"), [ECF No. 96–13]. The State Court Action was initially filed against an unidentified "John Doe" defendant. Chevaldina was subsequently compelled by the state trial court and the Third District Court of Appeal to reveal her identity as the blogger. [ECF Nos. 96–11, 96–12]. Chevaldina's husband, Dmitri Chevaldine, is also a defendant in the State Court Action. [ECF No. 96–13].

The plaintiffs in the State Court Action alleged that Chevaldina's blog posts are false, defamatory, and malicious. [*See, generally,* ECF No. 96–13]. After Chevaldina and her husband's business tenancy with Katz's shopping center ended, they began trespassing unto the plaintiffs' property and harassing Katz and his family, leading to a trespass warning from the police department. [ECF No. 96–13 ¶¶ 26–28]. Chevaldina and her husband attempted to sue the plaintiffs twice, and both of their lawsuits were dismissed with prejudice. [No. 96–13 ¶¶ 29–30].

The first judge in the State Court Action, the Honorable Valerie R. Manno Schurr, recognized Chevaldina's vitriol towards Katz, stating during a hearing that she was not a "journalist," but "somebody with a beef for somebody else." [Hr'g Tr.

14

42:9–15, Feb. 2, 2012, ECF No. 116–3].   The second judge on the case, the Honorable Ellen Leesfield, entered a preliminary injunction against Chevaldina,[4] and similarly recognized Chevaldina's incessant blogging about non-existent "recent crimes" and mischaracterization of historical information.  [Hr'g Tr. 55:3–7, 57:3–7, May 15, 2012, ECF No. 116–2].

Prior to the preliminary injunction being reversed, the third judge on the case, the Honorable Lisa S. Walsh, entered an Order to Show Cause as to why Chevaldina should not be held in criminal contempt after Chevaldina refused to abide by the preliminary injunction while it was still in effect.  [ECF No. 96–18].  During the litigation, Chevaldina also threatened Katz's counsel and their families, [ECF No. 87–1 at 15–21],  which was followed by Chevaldina and her husband's patently improper subpoenas to Katz's counsel, which asked for, among other things, counsels and their family members' IQ tests, CT Scans and high school transcripts.  [ECF Nos. 87 at 2–3; 87–1 at 24–43]. Upon reviewing the subject subpoenas, Judge Walsh immediately quashed them, finding them to be an "aggressive act," "shocking," "harassing and unprofessional," and likely to invoke a "physical reaction" from any lawyer.  [Hr'g Tr. 47:8–11, 67:11–19, 69:24–70:9, Aug. 23,

_____

[4] The preliminary injunction was subsequently reversed by the Third District Court of Appeal.  *Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014).

15

2013, ECF No. 96–20].  Judge Walsh imposed sanctions against Chevaldina, her husband and their counsel.  [ECF No. 104–5].  She also granted Katz and the other plaintiffs leave to ask for punitive damages against Chevaldina due to her outrageous unlawful misconduct.  [ECF No. 116–4].

However, before the case could be tried, Judge Walsh enforced a settlement agreement between Katz (and the other plaintiffs) and Chevaldina, ***which Chevaldina had solicited from the plaintiffs, but which she later attempted to rebuke***.  [ECF No. 151–2].  As explained in the order enforcing the settlement agreement, Chevaldina sent an unsolicited email to Katz's counsel offering to settle the State Court Action.  [ECF No. 151–2 ¶ 2].  She offered to pay $100,000 to Katz individually (and other sums to the corporate plaintiffs and to Katz's counsel) and agreed to remove the blog located at www.rkassociatesusa.blogspot.com and all of its content, which plaintiffs accepted.  [ECF No. 151–2 ¶¶ 4, 10–12].  Chevaldina then attempted to renege on her deal, but Judge Walsh enforced the settlement agreement on the terms Chevaldina offered to the plaintiffs and which the plaintiffs accepted.  [ECF No. 151–2].  Chevaldina appealed the order enforcing settlement and attempted to stay its effect, but after reviewing the parties' submissions, the Third District Court of Appeal denied her request for a stay.  [ECF No 159–1].

## III.    STANDARD OF REVIEW

This Court reviews "a district court's grant of summary judgment *de novo,* considering all the evidence and factual inferences in the light most favorable to the non-moving party." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232 (11th Cir. 2010); *see also Peter Letterese*, 533 F.3d at 1299.  To grant summary judgment, the District Court must, "upon viewing the admissible evidence and drawing all reasonable factual inferences therefrom in the light most favorable to the non-moving party, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Peter Letterese*, 533 F.3d at 1299.  It is well established that "district courts are not permitted to weigh evidence on a motion for summary judgment." *Shultz v. Sec'y of U.S. Air Force*, 522 Fed. Appx. 503, 505 (11th Cir. 2013).

## <u>SUMMARY OF THE ARGUMENT</u>

The District Court's analysis of Chevaldina's fair use defense is erroneous in both the methodology employed and findings made as to each of the fair use factors. To begin, the District Court's methodology was erroneous because the District Court did not perform a "work-by-work" analysis of Chevaldina's multiple infringements. This error manifested itself in the Court's analysis of the first fair use factor (the purpose of Chevaldina's infringement) and the third fair use factor (the amount and substantiality of the infringement).

17

Chevaldina copied the Photo in 25 blogs, ten times without alterations, five times with captions, and the rest in connection with cartoons.  Nevertheless, the District Court focused only on the ***altered*** Photos in finding that the Photo, whether altered or not, was used in ***all*** blog posts for the purpose of criticism and commentary, and that Chevaldina used only so much of the Photo as she needed to further her criticism.  The District Court should have analyzed each individual instance of infringement, viewing the evidence and factual inferences in the light most favorable to the Katz.  Because it did not do so, the District Court erred in granting summary judgment in favor of Chevaldina.

Furthermore, the District Court also erred in finding, as a matter of law, that the first fair use factor weighed in favor of fair use.  The first facet of the first fair use factor is whether Chevaldina infringed the Photo for a commercial or noncommercial use.  The District Court incorrectly found that Chevaldina's infringement was not a "commercial venture" based on the fact that she had not yet made any money from the blog posts.  Chevaldina, however, authored a blog post using the Photo to advertise a book she is writing about Katz.  Therefore, Chevaldina stands to profit from exploitation of the copyrighted Photo without paying the customary price.   In concluding otherwise, the District Court improperly weighed evidence and failed to view the evidence in the light most favorable to Katz.

18

Concerning the second facet of the first fair use factor, the District Court erred in finding that Chevaldina's use of the Photo was transformative as a matter of law. Looking at the blog posts that the District Court did **not** address, of her 25 infringements, Chevaldina copied the Photo at least ten times without any alteration whatsoever. Furthermore, Chevaldina did not alter the Photo from post to post, provide any broader commentary on the Photo, or change its aesthetics in any way to convey any message beyond the Photo's original purpose of identifying Katz. In her other posts, Chevaldina's minimal editing of the Photo or inclusion in cartoons does not change the result because the Photo was entirely unnecessary to, and does not further any alleged criticism. At best, there is a genuine issue of material fact that should be properly determined by the jury.

Moreover, the District Court also erred in finding that the second factor of fair use (the nature of the Photo) weighed in favor of fair use as a matter of law. The Photo was not simply factual in nature, as the District Court concluded. The Photo had mixed elements of fact and creativity because Magriso managed to capture a candid image of Katz, which took a certain level of creativity and decision-making in both the taking and publishing of the Photo. The third factor of fair use, therefore, is more properly regarded as neutral. The District Court again failed to view the facts in the light most favorable to Katz as to this factor as well.

In addition, the District Court erred in finding that the third factor of fair use (the amount and substantially of Chevaldina's use of the Photo) was neutral as a matter of law. This factor is intertwined with the first factor. As aforementioned, Chevaldina's pervasive and gratuitous use of the Photo did not further any criticism, and it was unnecessary for any criticism. As before, at best there is an issue of fact properly determined by the jury.

What is more, the District Court erred in finding that the fourth factor of fair use (the effect on the potential market of the Photo due to Chevaldina's infringement) weighed in favor of fair use as a matter of law. The District Court incorrectly focused on the fact that Katz had not and did not plan to profit from the Photo. A copyright owner that disavows any intention to publish his work is still entitled to protection of his copyright because (1) the relevant question is the existence of a *potential* market, and (2) he or she has the right to change his mind. The Photo has intrinsic value, as shown by, *inter alia*, Chevaldina's use of the Photo to advertise her book. Chevaldina's widespread dissemination of the Photo, which was not transformative, has harmed and continues to harm a potential market for the Photo, and at no point did Chevaldina affirmatively prove that there is no market harm. Thus, the District Court improvidently entered summary judgment against Katz for this additional reason.

20

Finally, but significantly, the District Court erred in not considering Chevaldina's pervasive bad faith and motives in its fair use analysis. The fair use doctrine is an equitable rule of reason that presupposes good faith and fair dealing. The fair use factors are not exclusive and should not be applied mechanically. Bad faith, although not dispositive, is relevant to the fair use analysis. Chevaldina's bad faith, as displayed and evidenced many times in her blog posts themselves, as well as in her conduct throughout the proceedings in the State Court Action, is directly relevant because it concerns the defamatory nature of Chevaldina's blog posts in which the Photo is included. It shows that Chevaldina's use of the Photo was not driven by the purpose protected under fair use (such as criticism), but for far more nefarious reasons. Indeed, Katz has alleged that Chevaldina's prolific publication of defamatory blogs against him and her pervasive infringement of his copyright were to harass him, harm him, and force him to pay her exorbitant sums of money to leave him alone.

## **ARGUMENT**

### I.    **The District Court's Methodology for Assessing Fair Use was Erroneous Because the District Court did not Perform a "Work-By-Work" Analysis on Each Individual Instance of Infringement**

The fair use doctrine as codified by Congress provides:

Notwithstanding the provisions of 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching

21

(including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C.A. § 107.

"Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985). The Court's analysis is a "flexible one," and the illustrated examples under the statute are not meant to be exhaustive or presumptively fair use. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1259 (11th Cir. 2014). "Fair use doctrine is an 'equitable rule of reason.'" *Peter Letterese*, 533 F.3d at 1308. "Furthermore, because fair use is an affirmative defense, its proponent bears the burden of proof in demonstrating that it applies." *Cambridge*, 769 F.3d at 1259.

Significantly, "the fair use analysis is highly fact-specific and must be performed on a work-by-work basis." *Id.* at 1261. In *Cambridge*, this Court analyzed 74 instances of infringement challenging Georgia State University's

practice of making digital excerpts of books available to students.  The appellants

argued that the "District Court erred by performing a ***work-by-work analysis*** that

focused on whether the ***use of each individual work*** was fair use rather than on the

broader context of ongoing practices at GSU."  *Id.* at 1259 (emphasis added).  This

Court disagreed, holding that "[f]air use must be determined on a case-by-case basis,

by applying the four factors to each work at issue."  *Id.*  This Court further explained:

> ***We understand "case-by-case" and "work-by-work" to be
> synonymous in cases where a copyright proprietor alleges numerous
> instances of copyright infringement*** and a secondary user claims that
> his or her use was fair.  ***Courts must apply the fair use factors to each
> work at issue.***  Otherwise, courts would have no principled method of
> determining whether a nebulous cloud of alleged infringements
> purportedly caused by a secondary user should be excused by the
> defense of fair use.

*Id.* at 1259 n.20 (emphasis added) (*citing Cariou v. Prince*, 714 F.3d 694, 711 (2d

Cir. 2013) (holding that while 25 of an artist's 30 paintings that incorporated

copyrighted photos were fair use, the remaining five paintings, which presented

minimal alterations of the original photos, presented a closer question, and remanded

to the district court), *cert. denied*, 134 S. Ct. 618 (2013)).

In this case, the District Court made the very error that this Court cautioned

against in *Cambridge*.  The District Court did not analyze each of Chevaldina's

multiple infringements on a work-by-work basis.  These errors manifest themselves

in the District Court's application of the first factor (purpose and character of the

use) and the third factor (the amount and substantiality of the work used) of fair use.

The District Court weighed the first fair use factor in favor of Chevaldina, concluding that "Defendant's use of the Photo was transformative and for the noncommercial purpose of criticism and commentary." [ECF No. 148 at 17]. After simply summarizing the blog post topics, [ECF No. 148 at 11–14], the District Court stated: "***These blog posts all*** present unabashed criticism of, and commentary on, Plaintiff's business and litigation practices." [ECF No. 148 at 14 (emphasis added)]. The District Court then found that Chevaldina's use of the Photo was transformative, reasoning that while the *Haaretz* article used the Photo to identify Katz and portrayed him in a "favorable light," Chevaldina "used the Photo in blog posts that disparage Plaintiff." [ECF No. 148 at 16].

Significantly, the District Court ***only*** pointed to the blog posts that used the Photos in cartoons or that used "derogatory captions," and ***did not mention the blog posts that used the unaltered Photo***:

> Haaretz used the Photo to identify Plaintiff, in an article about the possibility of Plaintiff acquiring an ownership interest in an Israeli basketball team. Notably, that article cast Plaintiff is a favorable light. In sharp contrast, Defendant used the Photo in blog posts that disparage Plaintiff. In some posts, Defendant cropped and pasted the image of Plaintiffs face into cartoons that either depicted him wearing a dunce cap or otherwise ridiculed his behavior. In other posts, the derogatory captions "DEAL WITH HIM AT YOUR OWN RISK,'' or "HE RIPPED OFF SPECIAL NEEDS LITTLE JEWISH GIRL,'' were superimposed on the Photo. Defendant did not use the Photo simply to identify Plaintiff, as did the Haaretz publication; rather, the record is clear that Defendant used it as a means of satirizing and criticizing Plaintiff. I find that Defendant's use of the Photo was transformative because it served a very different function than did its original use.

[ECF No. 148 at 16 (internal citations and footnote omitted)].

The District Court's methodology in applying the first factor is therefore, as *Cambridge* shows, fundamentally flawed. Preliminarily, whether the ***blog posts*** constitute criticism and commentary is not the proper subject of inquiry. The Copyright Act exempts from infringement "the fair use ***of a copyrighted work*** . . . for purposes such as criticism . . . . 17 U.S.C.A. § 107 (emphasis added). The copyrighted work here is the Photo, not the blog posts. [ECF No. 96–14, 96–15]. The proper question was whether in each of the Chevaldina's 25 infringing uses, did Chevaldina use ***the Photo*** for the purpose of criticism and commentary.

Regarding this question, the District Court could not properly find that ***all*** of Chevaldina's uses of the Photo were transformative based ***only*** on the blog posts that featured the Photo with a caption or within cartoons. Chevaldina copied the Photo ten times without alterations. [ECF No. 96–10 at 1—8, 11–14, 17–18, 25–27, 31–32, 37–41]. Those ten instances of unadulterated copying must be analyzed on their own merit, not as part of a "nebulous cloud of infringements." *Cambridge*, 769 F.3d at 1259.

The District Court's flawed methodology is also evident in its application of the third fair use factor, which the District Court found to be neutral. [ECF No. 148 at 20]. The District Court concluded, without much ado: "Depending on the topic of her blog post, Defendant copied only as much of the Photo as was needed to

further her criticism." [*Id.*]. Yet the District Court did not analyze each of Chevaldina's infringements relative to their particular blog post. Chevaldina used the Photo at least 25 times in blog posts of almost as many different topics—a singular image of Katz. [ECF No. 96–10]. And as aforementioned, while the Photo is sometimes paired with derogatory captions or cartoons, ten copies of the Photos were completely unchanged. [ECF No. 96–10 at 1—8, 11–14, 17–18, 25–27, 31–32, 37–41]. Among other things, the District Court did not find, and Chevaldina did not prove, how the Photo furthered or was necessary to further the claim that Katz allegedly has "criminal and discriminatory records," [ECF No. 96–10 at 1–2]; how the Photo furthered or was necessary to further the claim that Katz is purportedly "wiping out debt with Miami Heat players," [ECF No. 96–10 at 3–5]; or how the Photo furthered or was necessary to further the claim that Katz is suppressing freedom of speech. [ECF No. 96–10 at 11–12]. These and other questions, going down the line of blog posts, were not proven by Chevaldina.

The District Court should have analyzed each individual instance of infringement, viewing the evidence and factual inferences in the light most favorable to the Katz. *Latimer*, 601 F.3d at 1232. Because it did not, the District Court incorrectly granted summary judgment in favor of Chevaldina.

**II.    The District Court Erred in Finding that the First Fair Use Factor Favored Chevaldina as a Matter of Law.**

"The first factor in the fair-use analysis, the purpose and character of the allegedly infringing work, has several facets." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1269 (11th Cir. 2001). "Two such facets are (1) whether the use serves a nonprofit educational purpose, as opposed to a commercial purpose; and (2) the degree to which the work is a 'transformative' use, as opposed to a merely superseding use, of the copyrighted work." *Peter Letterese*, 533 F.3d at 1309.

### A.    Chevaldina's use of the Photo was Not Noncommercial as a Matter of Law

Under the commerciality facet, "[t]he Supreme Court has emphasized that '[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *Peter Letterese*, 533 F.3d at 1310 (citing *Harper*, 471 U.S. at 562).

The District Court found that Chevaldina's use of the Photo was noncommercial as a matter of law. [ECF No. 148 at 14–15]. In so finding, the District Court weighed the evidence and dismissed the fact that Chevaldina used the Photo in a blog post stating that she intended to write a book about her experience with RK Centers. [ECF No. 148 at 14]; *see* [ECF No. 96–10 at 17–18]. The District Court found that "Defendant's singular statement that she intended to write a book

27

about her experiences in business, even if one day acted upon, does not transform her blogs into a commercial venture," citing *Dhillon v. Does 1-10*, No. C 13-01465 SI, 2014 WL 722592 (N.D. Cal. Feb 25, 2014). [ECF No. 148 at 14]. The District Court instead found significant that there was no advertisements in the blog posts, and that Chevaldina had yet to make money from her use of the Photo. [ECF No. 148 at 15].

The District Court's findings misapply the commerciality facet of fair use, and neglects to view the evidence and factual inferences in the light most favorable to Katz. To begin, the question is not whether Chevaldina's overall practice of using the Photo was a "commercial venture," [ECF No. 148 at 14], but whether Chevaldina stood "to profit from exploitation of the copyrighted material without paying the customary price." *Peter Letterese*, 533 F.3d at 1310. To this end, Chevaldina indisputably authored a blog post advertising a book she is writing about Katz. [ECF No. 96–10 at 17]. Chevaldina posted the Photo front and center in her blog post; no other images were included. [*Id.*]. Notably, when asked about the status of the book on deposition, Chevaldina did not deny her intentions to write it, but lamented that this lawsuit has thus far prevented her from completing it. [Chevaldina Dep. at 131:7–22, ECF No. 96–7]. Moreover, even though Chevaldina filed an affidavit in this case, at no time did she deny having a profit-driven motive. [ECF No. 95–2]. In her own moving papers, Chevaldina admitted she used the Photo in a blog "stating

28

that Chevaldina is in the process of writing a book about Katz's conduct as a commercial landlord." [ECF No. 95 at 3].

The possibility that Chevaldina could make money from a book about Katz, which would be the direct result of her exploitation of the Photo to gain visibility and advertise the book, could lead a jury to decide that Chevaldina stood to profit from her use of the Photo without paying the customary price. The fact that Chevaldina does not have advertisements in her blog posts, or has yet to make any money from the blog posts, are but other facts for the jury to consider. In relying on these facts to grant summary judgment, while dismissing the blog post as a "singular statement," [ECF No. 148 at 14], the District Court impermissibly weighed evidence. *See Shultz*, 522 Fed. Appx. at 505; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment . . . .").

In addition, the District Court's reliance on the *Dhillon* decision was misplaced. In *Dhillon*, the District Court for the Northern District of California found that the posting of a political candidate's commissioned headshot in a website criticizing the candidate's political views was not a commercial use as a matter of law. 2014 WL 722592 at *4. The plaintiff in that case argued, ***without any factual basis***, that the operators of the website "realized some financial gain through the use

of the headshot photo." *Id.*    The court in *Dhillon*, however, held that "[t]hese conclusory, speculative assertions are insufficient to raise a genuine issue of material fact to defeat summary judgment." *Id.*  By contrast, there is direct evidence in this case—in Chevaldina's own words—that she has a profit motive.  [ECF Nos. 95 at 3, 96–10 at 17].

Accordingly, the District Court erred in holding that Chevaldina's use of the Photo was noncommercial as a matter of law.  There are at least genuine issues of material fact as to whether Chevaldina's stood to profit from the use of the Photo, which precluded the entry of summary judgment in her favor.

### B.    *Chevaldina's use of the Photo was Not Transformative as a Matter of Law*

#### 1.    Authority Governing Whether Use of the Photo was Transformative

Under the transformative facet, the Court must determine "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Cambridge*, 769 F.3d at 1262.  "A nontransformative use . . . is one which serves the same 'overall function' as the original work." *Id.*  Therefore, an infringer's use is not transformative where it involves little to no change to the work's original purpose, despite changes made to the work itself. *See Peter Letterese*, 533 F.3d at 1311 (Church of Scientology's use

of sales book excerpts in course materials was not transformative, although it used a different format, pedagogical tools, and condensed the material, because "these changes do not alter the educational character of the material taken from the book; they merely emphasize, rather than transform . . . ."); *Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 307–08 (3d Cir. 2011) (unaltered reproduction of photo within a website was not transformative, reasoning that "[t]he absence of any broader commentary—whether explicit or implicit—significantly undercuts the Station Defendants' argument that their use gave any new meaning to the Image."); *N. Jersey Media Group Inc. v. Pirro*, No. 13 CIV. 7153 ER, 2015 WL 542258, at *6 (S.D.N.Y. Feb. 10, 2015) (Fox News's copying of an image of firefighters rising the American flag after the 9/11 terrorist attack, where Fox News changed the image by cropping it, lowering the resolution, putting a smaller scale, juxtaposing it with the photo *Raising the Flag on Iwo Jima*, adding the phrase "# neverforget,"not transformative as a matter of law, even though it presented "a much closer call" than other cases, because the alterations were minimal, not adding a completely different aesthetic to the original image); *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, No. 13 CIV. 7574 KPF, 2015 WL 321863, at *7 (S.D.N.Y. Jan. 26, 2015) ("the Ross Image contains no surrounding commentary or criticism of the underlying source of the image, and the Ross Article makes no mention whatsoever of another publication. It is not enough for an image to be used in the course of news reporting;

the use must be transformative"); *Hill v. Pub. Advocate of the United States*, No. 12-CV-02550-WYD-KMT, 2014 WL 1293524, at * 7 (D. Colo. Mar. 31, 2014) (use of gay couple's wedding photo in anti-gay marriage mailer was not transformative, even though defendants used a different background and "placed a caption on the mailer," reasoning that "the mere fact that the photo was used for political purposes does not bolster the Defendants' argument."); *Morris v. Young*, 925 F. Supp. 2d 1078 (C.D. Cal. 2013) (use of photos of members of the band, the Sex Pistols, which defendant found on the internet, and which defendant slightly altered, was not transformative "because it lack[ed] any significant expression, meaning, or message that is unique vis à vis the works' original purpose." ); *Latimer v. Roaring Toyz, Inc.*, No. 806-CV-1921-T-30AEP, 2010 WL 3747148, at *4 (M.D. Fla. Sept. 21, 2010) (publication of motorcycle photos in motorcycle magazine not transformative because "there was minimal editing of the photos; they appeared in the magazine with substantially the same appearance as the originals.").

In cases where courts have found verbatim copying to be transformative, "the copy serves a different function than the original work." *Cambridge*, 769 F.3d at 1262 (citing *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1165 (9th Cir. 2007) (copying of website images to create an Internet search index instead of for entertainment, aesthetics, or information function); *A.V. v. iParadigms, LLC,* 562 F.3d 630, 640 (4th Cir. 2009) (copying student papers to detect plagiarism and not

for their original purpose); *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 609 (2d Cir. 2006) (copying concert posters to educate on history of concerts as opposed to advertising and informational purposes)).

In other instances where verbatim copying is deemed fair use, the work itself is considered newsworthy. For example, in *Nunez v. Caribbean Intern. News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000), fair use existed for a newspaper who published the copyrighted photographs a photographer took of a beauty pageant winner. In *Nunez*, the photographs themselves were particularly newsworthy due to controversy arising from the fact that a model was naked or nearly naked in one of the pictures. *Monge*, 688 F.3d at 1175 (interpreting *Nunez* and stating: "In *Nunez* 'the pictures were the story . . . .'").

As stated in *Monge*, "an infringer's separate purpose, by itself, does not necessarily create new aesthetics or a new work that 'alter[s] the first [work] with new expression, meaning or message.'" *Id.* (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998)). "A 'difference in purpose is not quite the same thing as transformation, and *Campbell* instructs that transformativeness is the critical inquiry under this factor.'" *Id.* (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

In *Monge*, the Ninth Circuit Court of Appeals held that a magazine's publishing of a professional singer's clandestine wedding photos was not

transformative due to minor cropping and inclusion of headlines and captions. *Id.* at 1174. The court agreed that the magazine's purpose in publishing the photos ran contrary to their original purpose—documenting private nuptials—but the court disagreed that this separate purpose was enough. *Id.* at 1176. The court concluded that the "use—wholesale copying sprinkled with written commentary—was at best minimally transformative." *Id.*.

Significantly, the *Monge* court noted that the photos in that case were entirely unnecessary to prove the controversy at issue—the secret marriage. *Id.* Thus, if an infringer uses copyrighted work that is not specifically related to the criticism or other purpose he or she claims to have—thereby adding no new expression, meaning, or message—then the infringer's use will ***not*** be considered transformative. This point is best highlighted in *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011), where the plaintiff sued music star Rhianna and others over her copying of protected expressions within the plaintiff's photos that Rhianna used in a music video. Rhianna argued the use of the expressions was fair use because they were used to "critic[ize] how Rhianna is treated by the press and comment on her relationship with the media." *Id.* The court rejected this argument, stating that "[c]ommenting on and criticizing Rhianna's treatment by the media is unrelated to the Photographs and does not require copying protectable elements of LaChapelle's work. Thus, defendants' fair use defense is unavailing." *Id.*

34

## 2.    Application to the Case *Sub Judice*

In the case *sub judice*, the District Court found that Chevaldina's use of the Photo was transformative, reasoning that while the *Haaretz* article used the Photo to identify Katz and portrayed him in a "favorable light," Chevaldina "used the Photo in blog posts that disparage Plaintiff."  [ECF No. 148 at 16].  Again, the District Court pointed to only the blog posts that used the Photos in cartoons or that used "derogatory captions," and did not mention the blog posts that used the Photo unaltered.  [ECF No. 148 at 16].

The District Court's findings are erroneous on several counts.  First, looking at the blog posts that the District Court did not address, of her 25 infringements, Chevaldina copied the Photo ten times without any alteration.  [ECF No. 96–10 at 1—8, 11–14, 17–18, 25–27, 31–32, 37–41].  While the blogs vary in topic, Chevaldina did not alter the Photo in any way from post to post, provided no "broader commentary" on the Photo, *Murphy*, 650 F.3d at 307–08, or change its aesthetics in any way to show a significant message beyond the Photo's original purpose of identifying Katz.  *Morris*, 925 F. Supp. 2d 1078.  These inactions weigh heavily against a finding of fair use.

The fact that the Photo is used within blog posts that disparage Katz does not, *ipso facto*, transform the Photo into something more than an image that simply identifies Katz.  While Chevaldina undoubtedly had a more nefarious purpose for

35

using the Photo than *Haaretz*, this is not enough to make her use transformative. *Monge*, 688 F.3d at 117; *Infinity Broad. Corp*, 150 F.3d 104; *Hill*, 2014 WL 1293524, at * 7.  Copying the unaltered Photo did not serve a different, specialized function, such as search indexing, *Perfect 10,* 508 F.3d at 1165, or catching plagiarism, *A.V.,* 562 F.3d at 640; or educating the public on rock history.  *Bill Graham,* 448 F.3d at 609.  Moreover, the Photo itself was not so noteworthy, as in *Nunez*, to justify wholesale copying.  Indeed, unlike in *Nunez*, Chevaldina provided absolutely no commentary regarding the Photo itself. *C.f. Nunez*, 235 F.3d at 23 ("by using the photographs in conjunction with editorial commentary, [defendant] did not merely 'supersede[ ] the objects of the original creation[s],' but instead used the works for 'a further purpose,' giving them a new 'meaning, or message.'").

    In addition, and contrary to the District Court's erroneous conclusion, the blog posts show that the Photo was entirely unnecessary to, and does not further, any alleged criticism.  For instance, in one blog post, Chevaldina claims that Katz has "criminal and discriminatory records," based on decades-old cases.  [ECF No. 96–10 at 1–2].  The Photo does not further this criticism; indeed, the Photo post-dates the cases Chevaldina references by several decades.  Chevaldina also uses the Photo in a blog post that accuses Katz of settling liens with the City of North Miami Beach by using Miami Heat players, [ECF No. 96–10 at 4]; yet the Photo does not further

this criticism either, such as, for example, portraying Katz with Miami Heat Players or in a meeting with City of North Miami Beach officials.

Chevaldina also contends that Katz, his son, and his companies wrongly sued the Jewish mother of a special needs child, portraying Katz and his son as anti-Semitic.  [ECF No. 96–10 at 6–8].  But again, the Photo does not further this criticism; it is not from the same time-frame as the lawsuit, nor does it portray Katz involved with the alleged parties.  Likewise, the Photo itself does not show how Katz is allegedly suppressing freedom of speech in the State Court Action.  [ECF No. 96–10 at 11–12].  The Photo is not even the subject of that lawsuit.  Finally, nothing in the Photo furthers any claim that Katz is in any way involved in improper business practices, in whatever permutation Chevaldina concocts.  [ECF No. 96–10 at 13–14]; [ECF No. 96–10 at 17–18]; [ECF No. 96–10 at 25–27]; [ECF No. 96–10 at 31–32]; [ECF No. 96–10 at 37–38].

Notably, in her moving papers, Chevaldina could only provide conclusory statements as to why she used the Photo in the blog posts:

> In this case . . .the Photograph was used in blog posts used to report news and to criticize Raanan Katz by, among other things, show that Plaintiff was attempting to use his position with the Miami Heat to secure personal advantage (D.E. 14-2 at pp. 3-4); criticize Katz's practices as a landlord and points out that Katz was jailed for his conduct in Massachusetts (id. at p. 71); and state that Katz brought a harassing libel lawsuit to silence critics (id. at p. 108), for example.

[ECF No. 95 at 17]. Chevaldina includes similarly conclusory statements in her Statement of Material Facts. *See* [ECF No. 99 at 2–3 (stating the "Photograph was posted in blogs to criticize Plaintiff by:" and then simply listing the substance of several blogs)]. However, the blog posts and her use of the Photo therein do not support her conclusions, and reveal that she used the Photo for the same purpose as its original use: to identify Katz.

Indeed, in her deposition, Chevaldina testified she used the picture to simply identify Katz because it was the only picture she had. [Chevaldina Dep. at 126:13–17, ECF No. 96–7 ("I am thinking that once you're writing an article and you say this person invented something people would like to see who's done it. So this is the only picture that I had.")]; *see also* [Chevaldina Dep. at 142:18–143:2, ECF No. 96–7 (testifying that "people need to see his face so they know who is doing this type of stuff.")]. As the District Court noted, the original purpose of the Photo was to identify Katz. [ECF No. 148 at 16]. Thus, her use was in no way transformative. While Chevaldina also gave other various purposes for using the Photo, trying to tie the unaesthetic nature of the Photo to the alleged criticism, [Chevaldina Dep. at 93:1–95:23, 114:4–115:8, 120:13–121:3, ECF No. 96–7], these inconsistent, alleged purposes for using the Photo have to be assessed by the jury. The District Court's findings fail to give due consideration to Chevaldina's testimony and the evidence

of record, and instead improperly weigh the evidence in the light most favorable to the nonmovant—the opposite of the standard on summary judgment.

With respect to the Photos that Chevaldina altered by adding captions, Chevaldina's minimal editing "was at best minimally transformative." *Monge*, 688 F.3d at 1176; *see also Hill*, 2014 WL 1293524, at * 7; *Morris*, 925 F. Supp. 2d 1078; *Latimer*, 2010 WL 3747148, at *4. Chevaldina added just two defamatory captions to five blog posts—"DEAL WITH HIM AT YOUR OWN RISK," [ECF No. 96–10 at 44], and "HE RIPPED-OFF SPECIAL NEEDS LITTLE JEWISH GIRL," [ECF No. 96–10 at 45–51]. The blog posts vary in topic from alleged improper business practices, to this lawsuit, to speaking on a lawsuit with a different tenant, to the registration of an unrelated service mark, to rehashing an earlier post stating that Katz is trying to settle debt using Miami Heat players. [*Id.*]. The original function of the Photo—to identify Katz—remains paramount.

Additionally, although Chevaldina's use of the Photo within cartoons admittedly presents a closer question, the result does not change. As explained in *Monge* and *LaChapelle*, where criticism is unrelated to the copyrighted work, and use of copyrighted elements is unnecessary, then there can be no fair use of the copyrighted work. *See Monge*, 688 F.3d at 1176; *LaChapelle*, 812 F. Supp. 2d at 448. Likewise here, the use of the Photo is unrelated and unnecessary to Chevaldina's criticisms. Indeed, in two blog posts where the Photo was used in

39

cartoons, the topic is Katz's son, Daniel, and not Katz himself.  [ECF No. 96–10 at 19–21 ("Daniel Katz Saga Of Fears Of Violence Continues"]; [ECF No. 96–10 at 22–24 ("RK Centers: Daniel Katz Real Fear, Fake Fear, Or No Fear?"].  Further showing how the Photo was unnecessary for any criticism, Chevaldina took it upon herself to replace the Photo, regardless of whether it was unaltered, captioned or in cartoons, with other images that she had, including other images of Katz.  *See* [ECF No. 96–16].  Her replacement of the Photo with other images did not change the nature of her blog posts or her disturbed messages therein.

The District Court's reliance on *Dhillon* actually highlights how Chevaldina's use the Photo was not transformative.  The commissioned headshot copied in *Dhillon* was used by the complaining political candidate "as a tool to positively market herself." 2014 WL 722592, at *5.  "By contrast, the defendant [in *Dhillon*] used the headshot photo in connection with an article criticizing the plaintiff's political views." *Id.*  Thus, "[r]ather than using the headshot photo as a positive marketing tool, as the plaintiff did, the defendant used the headshot photo as part of its criticism of, and commentary on, the plaintiff's politics." *Id.*

In other words, the infringer in *Dhillon* juxtaposed a political headshot—an inherently positive image—with negative political commentary, which furthered and contributed to the criticism, making the use of the headshot transformative.  The same cannot be said for Chevaldina's use of the Photo.  The Photo does not have an

inherent positive quality that, when placed within a negative context, would create "new expression, meaning or message." *Campbell*, 510 U.S. at 579.  In fact, it is unflattering to Katz in both its original use and in Chevaldina's infringement. Chevaldina did not add anything new to the Photo, but at best "emphasize[d]" the aesthetics of the Photo (or lack thereof), "rather than transform" the Photo into something new.  *Peter Letterese*, 533 F.3d at 1311.  Chevaldina's pervasive and unjustified use of the Photo simply cannot be compared to the fair use of a politician's politically framed headshot to further negative political discussion about the candidate.

In short, Chevaldina's prolific and exploitive uses of the Photo were not transformative as a matter of law, or were at best, minimally transformative, which does not weigh in favor of fair use.  At the very least, the facts shown above raise genuine issues of material fact that should be considered by a jury.   The District Court erred in weighing evidence and by failing to view the evidence in the light most favorable to Appellant.

III.    **The District Court Erred in Finding that the Nature of the Photo Weighed in Favor of Fair Use as a Matter of Law**

The second fair use factor, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Cambridge*, 769 F.3d at 1268 (quoting *Campbell,* 510 U.S. at 586).  Works that are

41

highly creative are afforded more protection, while factual works are afforded less protection. *Id.* The distinction lies on a spectrum; "[e]ven within the field of fact[ual] works, there are gradations as to the relative proportion of fact and fancy." *Id.* (quoting Harper & Row, 471 U.S. at 563).

### A.    *The Photo has Mixed Elements of Fact and Creativity, Making this Factor Neutral*

"Photography is an art that often involves a fair amount of skill to do well, and merits copyright protection." *Kienitz v. Sconnie Nation LLC*, 965 F. Supp. 2d 1042, 1052 (W.D. Wis. 2013). "Many courts have expressed trepidation at characterizing photographs as either factual or creative." *BWP Media USA*, 2015 WL 321863, at *8. Where photographs have mixed factual or creative characteristics, this factor of fair use is neutral. *Id.* (celebrity paparazzi photos have mixed elements of fact and creativity); *see also Balsley v. LFP, Inc.*, 691 F.3d 747, 760 (6th Cir. 2012) (factor neutral where amateur photographer took and published photos of a news anchor participating in wet t-shirt contest because, although he did not direct the subject or choose the background, photographer used artistic skill to edit the photo and select it for publication); *Kienitz*, 965 F. Supp. 2d at 1053 (factor neutral where a photographer took a candid shot of the Mayor of the City of Madison, Wisconsin during his inauguration).

In this case, the District Court found that the Photo was factual and not creative, rejecting Katz's argument that the Photo depicted Katz in a candid position,

which took creativity.   [ECF No. 148 at 19].   However, as best shown in the analogous case of *Kienitz*, which is persuasive here, the Photo is properly described as being both factual and creative.

The *Kienitz* court noted "that the photograph of [the Mayor] was not an 'artistic representation [ ] designed primarily to express [the photographer's] ideas, emotions, or feelings,' but [was] instead a candid image taken of the mayor at a political event."  965 F. Supp. 2d at 1052 (quoting *Nunez*, 235 F.3d at 23).  The court also noted that the photograph did "not contain or display as much artistic expression as the photographs in [other] cases . . . ."  *Id.* at 1052–53.  Nevertheless, the court found that the photo was not purely factual because the photographer "would have made at least some artistic/creative decisions with respect to composition, lighting and timing."  *Id.* at 1053.

In this case, similar to *Kienitz*, the Photo managed to capture Katz in a candid position. The photographer, Magriso, undoubtedly "would have made at least some artistic/creative decisions with respect to composition, lighting and timing," *Kienitz*, 965 F. Supp. 2d at 1053, and in the selection of the Photo for publication.  *See Balsley*, 691 F.3d at 760.  Because the nature of the Photo has both creative and factual elements, this factor is neutral.  To the extent that this is a close question, then it for the jury to decide, along with the other fair use factors, and it was improper for the District Court to enter summary judgment in favor of Chevaldina.

43

**IV.    The District Court Erred in Finding that the Amount and Substantiality of Chevaldina's Use of the Photo Was Neutral**

Under the third fair use factor, the Court "examines whether defendants have 'helped themselves overmuch' of the copyrighted work in light of the purpose and character of the use." *Cambridge*, 769 F.3d at 1271.  As *Cambridge* explains, "this factor is intertwined with the first factor" of fair use.  *Id.*  The inquiry "is a flexible one, rather than a simple determination of the percentage of the copyrighted work used." *Monge,* 688 F.3d at 1179.  The Court should look at both the qualitative and quantitative use of the copyrighted work to see if more of the work was used than was necessary.  *Cambridge*, 769 F.3d at 1271.  For instance, in *Monge,* even a "legitimate news gatherer" could not claim fair use where it gratuitously used protected photos in writing about a celebrity's clandestine wedding:

> While we do not discredit Maya's legitimate role as a news gatherer, its reporting purpose could have been served through publication of the couple's marriage certificate or other sources rather than copyrighted photos. Even absent official documentation, one clear portrait depicting the newly married couple in wedding garb with the priest would certainly have sufficed to verify the clandestine wedding. Maya used far more than was necessary to corroborate its story—all three wedding images and three post-wedding photos. Thus, analyzing both the quantitative and qualitative aspects of the published material, this factor weighs against fair use.

*Monge,* 688 F.3d at 1179.

Here, the District Court found that this factor was neutral, explaining that "[d]epending on the topic of her blog post, Defendant copied only as much of the

44

Photo as was needed to further her criticism." [ECF No. 148 at 20]. But as shown in the discussion above on the first fair use factor, not only did the District Court not properly analyze each individual infringement of the Photo, but there is at least a genuine issue of material fact as to whether the Photo was used to further any criticism. *See* discussion at section II(B) *infra*. Therefore, the District Court erred in holding that the third factor of fair use weighed in favor of Chevaldina as a matter of law.

## V.     The District Court Erred in Finding that the Effect on the Market of the Photo Weighs in Favor of Fair Use as a Matter of Law

Under the fourth fair use factor, the Court considers two inquiries: "(1) 'the extent of the market harm caused by the particular actions of the alleged infringer,' and (2) 'whether unrestricted and widespread conduct of the sort engaged in by the defendant [ ] would result in a substantially adverse impact on the potential market.'" *Cambridge*, 769 F.3d at 1275. In *Campbell,* this Court cautioned that while the Supreme Court has once described this factor as "the single most important element of fair use," *Harper*, 471 U.S. at 560, the Supreme Court later clarified that that the fair use analysis "is not to be simplified with brightline rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis. . . . Nor may the four statutory factors be treated in isolation, one from another. *Cambridge*, 769 F.3d at 1275 (quoting *Campbell*, 510 U.S. at 577–78).

45

The District Court found that Chevaldina's use of the Photo caused no market harm for several reasons, all of which are incorrect. First, the District Court concluded that there could be no market harm because "Plaintiff has stipulated that he and his related companies have suffered no economic harm as a result of Defendant's infringement." [ECF No. 148 at 21 (citing ECF No. 85)]. The District Court mischaracterized and misapplied Katz's stipulation. In the stipulation, while Katz stated that he "suffered no economic harm as a result of Defendant's infringement of Plaintiff's copyright as alleged in this lawsuit," he also specifically stated: "To be clear, Plaintiff has suffered irreparable harm, but such harm is not subject to calculation by any accurate standard and no documents or financial discovery could possibly show or tend to indicate to the contrary." [ECF No. 85]. Katz reiterated this in his affidavit, in which he stated:

> Due to the nature of her infringement and the breadth of the internet, I am unable to calculate the amount of economic harm I have suffered as a result of Ms. Chevaldina's infringement of my Copyright. In fact, I may never learn of the people and businesses who didn't do business with me, or who changed the way they conduct business with me as a result of Ms. Chevaldina's infringement. However, any continued infringement on the Copyright will cause me irreparable harm for which money cannot adequately compensate me.

[Katz Aff. ¶ 19, ECF No. 116–1]. The stipulation, therefore, cannot fairly be equated to an admission that there is no economic harm. The Court was required to view the stipulation in the light most favorable to Katz, but did not do so.

46

Second, the District Court misapplied the market harm factor when it found that Katz "has not shown that a potential market exists for the Photo or that Defendant's use threatens the potential market." [ECF No. 148 at 21–22]. In its finding, the District Court believed it was significant that Katz did not have a present intention to sell or profit from the Photo. [ECF No. 148 at 21]. However, "[e]ven an author who ha[s] disavowed any intention to publish his work during his lifetime [is] entitled to protection of his copyright, first, because the relevant consideration [is] the 'potential market' and, second, because he has the right to change his mind." *Peter Letterese*, 533 F.3d at 1317 (quoting *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000)).

In *Peter Letterese*, the exclusive licensee of a copyright in a book about sales techniques (*Big League Sales*), which was copied by the Church of Scientology for use in educational courses, stipulated that it failed to develop a market for the book or its derivative works, and would not do so in the future. *Id.* This Court held that "[s]uch a concession, however, falls short of establishing that the intrinsic value of the copyright is zero." *Id.* The Court explained that the plaintiff "is not required to prove that it has actually developed or will develop a market for *Big League Sales* or derivative works; even if a plaintiff "has evidenced little if any interest in exploiting [a] market for derivative works . . . , the copyright law must respect that

47

creative and economic choice." *Id.* (quoting *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 144-45 (2d Cir. 1998)).

This Court went on to hold that there was the possibility of potential market harm due to the some of the defendants' widespread dissemination of the "heart" of the work, which was nontransformative, and the defendants failed to provide evidence of lack of market harm:

> The question remains, therefore, whether defendants' use, or widespread use of the same kind, would result in substantial adverse harm to the potential market for *Big League Sales* or derivative works, which "includes only those [markets] that creators of original works would in general develop or license others to develop." With respect to the WISE Sales Course, we think it may. The unrestricted and widespread dissemination of the Sales Course—a use that is not transformative of the book and may be regarded as appropriating "the heart" of its expression—namely, the selection and structure of sales techniques and distinctive descriptions thereof—may well usurp the potential market for *Big League Sales* and derivative works. Defendants have provided insufficient evidence in support of their claim that the Sales Course is unlikely to adversely affect the potential market.

*Id.* at 1317–18 (internal citations omitted). Accordingly, the *Peter Letterese* Court held that the defendants were ***not entitled to summary judgment based on fair use*** as to those uses. *Id.* at 1319 ("Given the lack of sufficient evidence disproving the likelihood that widespread dissemination of the WISE Sales Course would supplant PL&A's market for derivative works, the fourth factor also favors PL&A with

respect to those course materials. Defendants have therefore failed to prove their entitlement to summary judgment based on fair use with respect to Count 1.").[5]

Although Katz had no desire or plan to sell or profit from the Photo, the copyright in the Photo still has intrinsic value, as Chevaldina demonstrated through the use of her blog posts. *See, e.g.,* [ECF No. 96–10 at 17–18 (advertising a book using the Photo)]. As explained above, Chevaldina's use of the Photo was widespread and not transformative. Chevaldina copied the Photo ten times without any alterations. [ECF No. 96–10 at 1—8, 11–14, 17–18, 25–27, 31–32, 37–41]. In other blogs, Chevaldina added two simple captions, [ECF No. 96–10 at 45–51], which were likewise not transformative. *See Monge*, 688 F.3d at 1176; *Hill*, 2014 WL 1293524, at * 7; *Morris*, 925 F. Supp. 2d 1078; *Latimer*, 2010 WL 3747148, at *4. Moreover, while Chevaldina's use of the Photo within cartoons is a closer question, the cartoons included the "heart" of the Photo, i.e., Katz's face, [ECF No. 96–10 at 9, 10, 15, 16, 19–24, 28–30, 33–35, 36, 42–43], and the Photo was unnecessary for any purported criticism, so it cannot be considered fair use. *See Monge*, 688 F.3d at 1176; *LaChapelle*, 812 F. Supp. 2d at 448.[6]

---

[5] Katz maintains that *Dhillon*, which, like the District Court, focused on the plaintiffs' lack of attempt to sell the headshot in that case, is unpersuasive in light of *Peter Letterese*.

[6] The District Court's reliance on *Righthaven, LCC v. Jama*, No. 2:10-CV-1322 JCM LRL, 2011 WL 1541613, at *2 (D. Nev. April 22, 2011), to suggest that Katz's use of the Photo is solely "litigation-driven," is also misplaced. Katz specifically averred

At no point did Chevaldina affirmatively prove that there is no potential market harm.  At the very least, a genuine issue of fact remained for the jury to consider on this factor.  Therefore, the District Court erred in holding that the fourth factor of fair use weighed in favor of Chevaldina as a matter of law and in entering summary judgment in favor of Chevaldina.

## VI.    The District Court Erred in Failing to Consider Chevaldina's Pervasive Bad Faith and Motives When Conducting the Fair Use Analysis

The District Court summarily rejected Katz's argument that Chevaldina is not entitled to her fair use defense because she has engaged in pervasive bad faith.  [ECF No. 148 at 24 n.10].  The District Court reasoned that "'[g]ood faith' is not listed as a fair use factor in §107 of the Copyright Act;" that *Harper's* reference to good faith and fair dealing was "called . . . into question" by *Campbell*; and that Chevaldina's conduct in the State Court Action was irrelevant because bad faith within fair use is limited to "whether the alleged infringer used copyrighted material to usurp a commercial advantage that belonged to the copyright holder, or obtained the material in an underhanded manner."  [ECF No. 148 at 24 n.10].

The District Court's findings, however, misapplies the fair use doctrine.  This Court has held that the "[f]air use doctrine is an 'equitable rule of reason'; [and]

---

that he did not acquire the Photo to bring litigation against Chevaldina, but actively sought to avoid litigation.  [Katz Aff. ¶ 18, ECF No. 116–1].

neither the examples of possible fair uses nor the four statutory factors are to be considered exclusive. *Id.* at 1308. "[T]he four factors 'do not mechanistically resolve fair use issues.'" *Cambridge*, 769 F.3d at 1260 (quoting *Harper*, 471 U.S. at 588). In addition, this Court has made clear that "[e]vidence of bad faith may be a relevant, but not necessarily dispositive, aspect of the first factor." *Peter Letterese*, 533 F.3d at 1312 n.27. Notably, in *Peter Letterese*, this Court cited to the very same footnote in the *Campbell* decision that the District Court relied on. *Id.* *Campbell* did not reject an examination of the infringer's state of mind, but simply concluded that bad faith was irrelevant in the particular facts of that case.[7] *Campbell*, 510 U.S. at 585 n.18.

Furthermore, while in some cases bad faith made be found in the manner in which the infringer obtains copyrighted material, as the District Court suggested, [ECF No. 148 at 24 n.10], this is not the exclusive category of bad faith. Each fair use case is "highly fact-specific" and therefore must be decided on the "circumstances of the individual instances of alleged infringement involved in this case." *Cambridge*, 769 F.3d at 1261 ("because the fair use analysis is highly fact-specific and must be performed on a work-by-work basis, *see Cariou,* 714 F.3d at

---

[7] In *Campbell*, the Supreme Court explained that evidence of the copyright owner's denial for 2 Live Crew to use the original song, *Oh Pretty Woman*, did not weigh against a finding of fair use because the offer could have been a good faith attempt to avoid litigation. *Campbell*, 510 U.S. at 585 n.18.

694, the coursepack cases provide guidance but do not dictate the results here, which must be based upon a careful consideration of the circumstances of the individual instances of alleged infringement involved in this case.").

In this case, evidence of Chevaldina's pervasive bad faith as displayed and perpetuated in the blog posts wherein the Photo appears dozens of times as well as in the State Court Case is directly relevant to this case.  It shows that Chevaldina's use of the Photo was ***not*** driven by the purpose protected under fair use (such as criticism), but for far more nefarious reasons.  She has used the Photo "in rapid succession . . . in her efforts to cause [Katz] harm or unlawfully extract money" from Katz.  [Katz Aff. ¶ 7, ECF No. 116–1].

The first judge on the State Court Action aptly described Chevaldina as "somebody with a beef for somebody else," [Hr'g Tr. 42:9–15, ECF No. 116–3], while another judge recognized Chevaldina's incessant blogging about non-existent "recent crimes" and mischaracterization of historical information about Katz.  [Hr'g Tr. 55:3–7, 57:3–7, ECF No. 116–2].  The third judge entered an Order to Show Cause against Chevaldina when she refused to abide by a preliminary injunction while it was still valid.  [ECF No. 96–18].  Chevaldina also threatened Katz's counsel and their families in the State Court Action.  [ECF No. 87–1 at 15–21].  Chevaldina's threats were followed by her and her husband's patently improper subpoenas to Katz's counsel, [ECF No. 87 at 2–3, 87–1 at 24–43], which Judge Walsh

immediately quashed, calling them an "aggressive act," "shocking," "harassing and unprofessional," and likely to invoke a "physical reaction" from any lawyer. [Hr. Tr. 47:8–11, 67:11–19, 69:24–70:9, ECF No. 96–20]. As a result, Judge Walsh entered an Order imposing sanctions on Chevaldina, her husband, and their counsel. [ECF No. 104–5]. Judge Walsh also granted Katz and the other plaintiffs the possibility of obtaining punitive damages against Chevaldina due to her outrageous unlawful misconduct [ECF No. 116–4]. However, Chevaldina then solicited from the plaintiffs a settlement, agreeing to remove her blog from the internet and to pay Katz, his son and their companies over $150,000. [ECF No. 151–2]. Her efforts since to rebuke and stay the settlement have been rejected by the state court and the Third District Court of Appeal. [ECF Nos. 151–2, 159–1].

These are not the actions of a person fairly using a Photo to criticize and comment on business practices. These facts should have been considered by the District Court when ruling upon Chevaldina's fair use defense. The District Court failed to consider all of the evidence and factual inferences in the light most favorable to Katz, and erred in entering summary judgment against Katz when genuine issues of material fact remained for the jury's consideration.

## **CONCLUSION**

Some cases fit properly within the protections of the fair use doctrine. The use of a political candidate's headshot as part of actual criticism and commentary on

the candidate's political views is fair use. *Dhillon*, 2014 WL 722592. Incessantly and vindictively harassing a person and their family by using a photo in numerous blog posts to extract financial gain, or to simply harass, defame or otherwise harm the copyright owner, is not. Thus, for the reasons stated above, Appellant, Raanan Katz, respectfully requests that this Court reverse the District Court's entry of summary judgment in favor Appellee, Irina Chevaldina, and to enter such other and further relief in favor of Appellant as this Court deems just and proper.

Respectfully submitted,

**KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.**
Attorneys for Appellant
201 South Biscayne Boulevard,
Twenty-Seventh Floor
Miami, Florida 33131
Telephone: (305) 379-9000
Facsimile: (305) 379-3428

By: /s/ Todd A. Levine
Alan J. Kluger
Florida Bar No: 200379
Todd A. Levine
Florida Bar No:899119
Jorge R. Delgado
Florida Bar No: 084118

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 23(a)(7)(B) because the brief contains less than 14,000 words (<u>13,756</u>), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman.

By: <u>/s/ Todd A. Levine</u>
Todd A. Levine

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2015, 7 copies of the brief were dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

John Ley, Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

On this same date, a copy of the brief was served on the following by third party commercial carrier:

Irina Chevaldina
1835 E. Hallandale Beach Blvd., #400
Hallandale Beach, FL 33009
irina.chevaldina@hotmail.com
*pro se* Appellee

*/s/ Catherine B. Simpson*
Counsel Press, LLC
1011 East Main Street
Richmond, VA 23219
(804) 648-3664

Filing and service were performed by direction of counsel